UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MANUEL JARAMA,<br>ELDORADO MASSINGUE, and<br>HUGO MARCELO TENEPAGUAY-FAREZ<br><br>Petitioners,<br><br>v.<br><br>CHRISTOPHER DONELAN,<br>Sheriff of Franklin County<br><br>Respondent. | Case No. 3:20-cv-30062-MGM |

## OPPOSITION TO PETITIONERS' MOTION FOR A PRELIMINARY INJUNCTION

The Franklin County House of Correction ("Franklin County") has enacted numerous safety measures aimed at mitigating the risk that inmates, detainees, and staff contract COVID-19.  To date, no inmate or detainee at Franklin County has tested positive.  Petitioners, in their Petition (Doc. # 1) and their motion for a preliminary injunction (Doc. # 2), seek their release from custody.  Petitioners have not met their burden of proof in seeking extraordinary relief through a preliminary injunction.

First, Petitioners do not have a cognizable injury, much less an irreparable one. As this Court has recognized, Franklin County has taken extensive steps to limit the threat of COVID-19 to all at the facility. *See Kondjoua v. Streeter*, Case No. 3:20-cv-10698-MGM, Electronic Order (Doc. # 12) (D. Mass. Apr. 16, 2020). Petitioners' request for a preliminary injunction should be denied because their constitutional claims lack merit and the balance of equities and public interest tilt against granting a temporary restraining order.

## BACKGROUNDS OF PETITIONERS

### A.  Petitioner Manuel Jarama

Petitioner Jarama is a native and citizen of Ecuador who became a lawful permanent resident in 2002. *See* Declaration of David T. Wesling ("Wesling Decl."), attached hereto as Exhibit A, ¶ 6.[1] On May 1, 2009, Jarama was convicted and sentenced in Superior Court at Danbury, Connecticut for: (1) sexual assault in the first degree, in violation of Conn. Gen. Stat. § 53a-70(a)(2), for which he was sentenced to a term of imprisonment of fifteen years, with five years mandatory minimum, and five years parole with special conditions; (2) three counts of risk of injury to a minor (sexual contact), in violation of Conn. Gen. Stat. § 53-21(a)(2), for which he was sentenced to a term of imprisonment of twenty years jail and twenty years' probation with special conditions; (3) two counts of sexual assault in the second degree, in violation of Conn. Gen. Stat. § 53a-71(a)(1), for which he was sentenced to a term of imprisonment of twenty years and twenty years' probation; and (4) assault in the third degree, in violation of Conn. Gen. Stat. § 53a-61(a)(1), for which he was sentenced to a term of one-year term of imprisonment. *Id.* ¶¶ 7-10.

While Petitioner Jarama was in state custody in Connecticut, ICE served him with a Notice to Appear (NTA), which it filed in the Hartford Immigration Court, on October 22, 2010. *Id.* ¶ 11. The filing of the NTA initiated removal proceedings. *Id.* Petitioner Jarama did not apply for any forms of relief or protection from removal, and was therefore ordered removed on October 20, 2011. *Id.* Petitioner Jarama did not file an appeal of his removal order to the Board of Immigration Appeals. *Id.*

Petitioner Jarama was released from state custody on March 9, 2020 and immediately taken

---

[1]     Out of an abundance of caution, Respondent is filing the Wesling Declaration, as well as that of Lieutenant Lee Tirrell, with both this opposition and his opposition to Petitioner's habeas petition. The exhibits filed with the two oppositions are identical.

into state custody. *Id.* ¶ 12. Because he has a final order of removal, which mandates detention during a 90-day removal period, Petitioner Jarama is detained pursuant to 8 U.S.C. § 1231. *Id.* ICE obtained a travel document for Petitioner Jarama on March 26, 2020. *Id.* ¶ 13. And he is scheduled for removal from the United States to Ecuador during the first week of June. *Id.* In order to effectuate his removal, Petitioner Jarama is scheduled for transfer out of the District of Massachusetts at the end of May. *Id.*

### B.  Petitioner Eldorado Massingue

Petitioner Eldorando Massingue is a native and citizen of Mozambique. Wesling Decl. ¶ 22. He was last admitted to the United States on January 1, 2015. *Id.* On June 16, 2019, ICE learned that he had been arrested by the Newington, Connecticut Police Department for Disorderly Conduct, Risk of Injury to a Child, Interfere with/Resist Officer, and Unlawful Restraint, and that he was in state custody at the Hartford Correctional Center. *Id.* ¶ 24. Petitioner Massingue was convicted on August 1, 2019 of reckless endangerment in the second degree, for which he received a sentence of six months, execution suspended after 15 days, and eleven months probation. *Id.* ¶ 34. He was also convicted of disorderly conduct and received a sentence of three months in jail, execution suspended after fifteen days, and eleven months probation. *Id.*

On June 24, 2019, Petitioner Massingue was released from state custody and was taken into custody by ICE. *Id.* ¶ 24. He sought a custody redetermination hearing before the Hartford Immigration Court. *Id.* ¶ 25. An Immigration Judge determined that Petitioner Massingue had not met his burden of proof to demonstrate that he was not a danger to the community. *Id.*

At his hearing, Petitioner Massingue testified to three arrests prior to his June 2019. *Id.* ¶¶ 26-28. The first arrest occurred in West Hartford, Connecticut in October 2015, and resulted in a charge of driving while intoxicated. *Id.* ¶ 26. He testified before the Immigration Judge that he

had five to six alcoholic drinks before driving and that the charges were dismissed after he completed an alcohol awareness program. *Id.* He also testified that three months later he was arrested in Miami, Florida and charged with trespass. *Id.* ¶ 27. He testified that this arrest occurred after he had been drinking alcohol and that he had five to six alcoholic drinks before being arrested. *Id.* This charge was dismissed after he completed a class. *Id.* He also testified that he was arrested in October of 2016 and charged with burglary in the first degree and assault in the third degree. *Id.* ¶ 28. He testified that this arrest involved an ex-girlfriend and that the charges were dismissed. *Id.* A restraining order was issued after this arrest. *Id.*

Petitioner Massingue also testified before the Immigration Judge about his arrest on June 15, 2019. *Id.* ¶ 29. He testified that this arrest occurred after he had been drinking throughout the day and night. *Id.* According to a Newington Police Department Case/Incident Report, the Newington Police Department responded to Petitioner Massingue's house twice—once on June 15, 2019 and again in the early morning of June 16, 2019. *Id.* ¶ 30. When police first came to the house, Petitioner Massingue and his spouse told the police officers that the 911 call had been made mistakenly. *Id.* ¶

During the second response to Petitioner's house, the individual who called the police, labeled as Jane Doe in the incident report, advised the Police Officers that Petitioner Massingue was intoxicated, holding a child, and refusing to give the child to her. *Id.* ¶ 31. The incident report notes that Petitioner Massingue became extremely agitated when he observed the police officers and was verbally combative with the police officers. *Id.* When the police officers attempted to arrest Petitioner Massingue, he began to physically resist the officers. *Id.* ¶ 32. A police officer activated his taser and delivered a six second deployment to the petitioner. *Id.*

Due to his prior arrests, and based on the testimony, the Immigration Judge found that

Petitioner Massingue failed to meet his burden of showing that he was not a danger to the community based on the nature of his prior crimes, repeated arrests involving alcohol, and the recency of his arrests. *Id.* ¶ 25. Petitioner Massingue appealed the Immigration Judge's decision to not set a bond to the Board of Immigration Appeals ("BIA"). *Id.* ¶ 35. The BIA dismissed his appeal on December 26, 2019. *Id.* The BIA stated that "[o]verall, based on the [petitioner's] history of excessive drinking and arrests involving violence, we agree with the Immigration Judge that the [petitioner] has not satisfied his burden of proving that he is not a danger to the community." *Id.* ¶36.

On September 4, 2019, Petitioner Massingue had his merits hearing before the Hartford Immigration Court in which he applied for Adjustment of Status as his relief from removal from the United States. *Id.* ¶ 37. The Immigration Judge denied this application as a matter of discretion and ordered him removed from the United States. *Id.* Petitioner Massingue appealed this decision to the BIA and the BIA dismissed his appeal on February 27, 2020. *Id.* ¶ 38. Petitioner Massingue appealed the BIA's affirmance of his removal order to the U.S. Court of Appeals for the Second Circuit on March 20, 2020, by filing a petition for review (PFR). *Id.* ¶ 40.

While his appeal was pending, Petitioner Massingue filed a habeas petition seeking a new bond hearing. *See generally Massingue v. Streeter*, Case No. 3:19-cv-30159-KAR, Petition (Doc. # 1) (D. Mass. Dec. 5, 2019). U.S. Magistrate Judge Katherine A. Roberston, ordered that Petitioner Massingue should receive a new bond hearing. Wesling Decl. ¶ 39. He received a hearing before the Boston Immigration Court on February 24, 2020. Wesling Decl. ¶ 39. At that hearing, the Immigration Judge determined that ICE met its burden of proof to demonstrate that Massingue was a danger to the community. *Id.*

ICE received a travel document for Petitioner Massingue on March 23, 2020. Wesling

Decl. ¶ 41. And ICE scheduled him for removal on April 16, 2020. *Id.* ¶ 42. However, Petitioner Massingue filed a motion to stay removal with the Second Circuit on April 15, 2020, and ICE was unable to effectuate his removal. *Id.* On April 24, 2020, the Department of Justice's Office of Immigration Litigation filed a motion to dismiss Petitioner Massingue's PFR. The government also renewed its opposition to Petitioner Massingue's stay of removal and provided notice to the Second Circuit that ICE would not forbear removal past May 24, 2020. *Id.* ¶ 43. The government also notified the Second Circuit that it did not oppose Massingue's April 22, 2020 filing in which he sought to withdraw his stay of removal. *Id.* ICE has therefore rescheduled Massingue's removal for early June 2020 out of Boston, Massachusetts. *Id.* ¶ 44.

### C. Petitioner Hugo Tenepaguay-Farez

Petitioner Farez is a native and citizen of Ecuador who entered the United States unlawfully at an unknown date, time, and place. Wesling Decl. ¶ 15. He was arrested by the U.S. Border Patrol on October 1, 2012 in Karnes City, Texas. *Id.* He was provided with a Notice to Appear and entered into removal proceedings. *Id.* Petitioner Farez was scheduled for a hearing before the Hartford Immigration Court on November 21, 2012, but he failed to appear at this hearing and was therefore ordered removed from the United States. *Id.* ¶ 16.

ICE subsequently learned that Petitioner Farez was arrested by the Danbury, Connecticut police department on February 2, 2020 for a traffic offense. *Id.* ¶ 17. ICE took him into custody on February 27, 2020 and detained him pursuant to 8 U.S.C. § 1231 which mandates detention during a 90-day removal period. *Id.* ¶ 18. Petitioner Farez filed a motion to reopen his removal proceedings on March 11, 2020. *Id.* ¶ 19. An Immigration Judge denied the motion on March 26, 2020, after finding that Farez had sufficient notice of his hearing for which he did not appear. *Id.* Petitioner did not appeal this decision to the Board of Immigration Appeals. *Id.*

On March 10, 2020, ICE obtained a travel document for Petitioner Farez. *Id.* ¶ 20. And he scheduled for removal to Ecuador during the first week of June. *Id.* In order to facilitate his removal, Petitioner Farez is scheduled for transfer from Massachusetts at the end of May. *Id.*

## FRANKLIN COUNTY HOUSE OF CORRECTIONS
## RESPONSE TO THE COVID-19 OUTBREAK

With the onset of COVID-19 in the United States, Franklin County has instituted strict protocols to keep inmates, detainees, and staff safe, and take all prudent measures to prevent exposure to the COVID-19 virus. *See generally* Tirrell Aff. & Statement of Lori Streeter, Superintendent of the Franklin County House of Corrections, attached thereto. And on April 10, 2020, ICE released its COVID-19 Pandemic Response Requirements (PRR), a guidance document that builds upon previously issued guidance and sets forth specific mandatory requirements expected to be adopted by all detention facilities housing ICE detainees.[2]

1.    Population at Franklin County House of Corrections

The Franklin County House of Corrections, which has a capacity of 248 inmates, current is operating at 42% of capacity with 122 total inmates. Declaration of Lieutenant Lee Tirrell ("Tirrell Aff."), attached hereto as Exhibit B, ¶ 2. The facility is divided into separate units. The unit in which Petitioners are housed has a maximum capacity of 71 individuals, but at this time it is at 39% capacity with 28 individuals – fourteen of whom are Immigration and Customs Enforcement detainees. *Id.* ¶ 3. Franklin County is not currently accepting new inmates or detainees unless ordered to accept an individual. *Id.* ¶ 2. Franklin County accepted eight pretrial detainnes over the past few weeks, all of whom were quarantined upon arrival. *Id.* ¶ 4.

---

[2]    See U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, COVID-19 Pandemic Response Requirements, April 10, 2020, (available at https://www.ice.gov/sites/default/files/documents/Document/2020/eroCOVID19responseReqsCleanFacilities.pdf (viewed Apr. 15, 2020); *see also* ICE Guidance on COVID-19, available at https://www.ice.gov/coronavirus (viewed Apr. 15, 2020).

The number of staff physically working at the facility varies from day to day, but typically the facility is staffed by approximately 15 officers per shift, a kitchen staff of five, 6-10 administrative staff, and 3-5 maintenance staff. *Id.* ¶ 5. Medical staff on site on any particular date varies from four to eight, depending on the shift. *Id.*

2. <u>Franklin County House of Corrections COVID-19 Protocols</u>

Franklin County has implemented official social distancing policies. Tirrell Aff. ¶ 6. The initiation of our COVID-19 preventative measures have been received well by the inmate population who have expressed their understanding as to the measures taken and have been cooperative. *Id.* ¶ 18. All Officers have been trained on the proper social distancing recommendations (6 feet apart) when speaking to inmates/detainees and conducting security rounds. *Id.* ¶ 13. The medical department met with all inmates/detainees on the proper social distancing recommendations. *Id.* The maintenance department placed a 6 foot outline, with tape on the floor around the officer stations in all housing units. *Id.* Posters and other documentation has been posted in all housing units on the proper handwashing procedures, how to stop the spread of germs and a COVID-19 fact sheet. *Id.*

The facility has also implemented extensive procedures for disinfecting spaces and surfaces. *Id.* ¶ 14. All inmates and inmate workers have been instructed on the importance of cleaning and disinfection of all surfaces, especially "high touch" areas such as tables, community sink, door handles, inmate telephones, etc. *Id.* Additional disinfecting chemicals have been purchased in order to disinfect these areas. *Id.* Cleaning and disinfection takes place numerous times per day; after every meal period as well as at the conclusion of the day after final lock in. *Id.* All inmates/detainees have access to any cleaning supplies and chemicals upon request during out of cell time. *Id.* Maintenance workers are coming in 7 days a week to clean and disinfect staff areas

along with common areas in the hallways. *Id.*

Franklin County has also taken steps to prepare for quarantine of individuals at the facility. *Id.* ¶ 15. As noted, the facility is not taking any new commitments from local police departments. *Id.* If quarantine is necessary for any individual already present at the facility, that individual will be housed in the booking area, which as a capacity of 2-4 people. *Id.* A medical second quarantine area has also been set up in the library and classrooms area and has a capacity of 14 people. *Id.* In the event there is an outbreak at the facility, the entire facility will go into a lockdown. *Id.* ¶ 17. A list of approximately 40 correctional staff along with medical and civilian kitchen staff have volunteered to work "12 hours on/12 hours off" shifts. *Id.* If the infected number of infected inmates/detainees reaches beyond capacity of the Booking/Programs area, an entire housing unit will be designated as a quarantine unit. *Id.*

All new detainees are placed in a 14 day isolation upon arrival. *Id.* ¶ 15. On April 10, 2020, James Lincoln arrived at Franklin County as a pretrial detainee. *Id.* ¶ 16. After seven days at the facility, he developed an abscess that required surgical intervention. *See id.*, Statement of Dr. Ruth A. Potee, Medical Director, Franklin County House of Corrections (attached to Tirrell Aff.). At the hospital, he received a COVID-19 test, which was negative, and he was kept separate from all potential COVID-19 patients. *Id.* He subsequently returned to Franklin County where he continued his quarantine. *Id.* As of today's date, more than 30 days after entering the facility, Mr. Lincoln exhibits no COVID-19 symptoms. *Id.*

3. <u>Physical Spaces at Franklin County House of Corrections</u>

No inmates in Petitioners' unit share a cell and each inmate has his own sink and toilet. Tirrell Aff. ¶ 7. There are five showers available to the detainees in the unit. *Id.* Each shower stall is 26 square feet and separated from the other showers by metal partitions. *Id.* While in common

areas, all individuals at the facility are instructed and expected to maintain the required six foot social distancing guidelines. *Id.* ¶ 6. Inmates have also been provided with masks to wear in common areas. *Id.* Individuals detained in Petitioners' unit currently eat meals in groups of roughly 14 individuals. *Id.* ¶ 8. The space in which the individuals eat is part of the 2450 square foot common area. *Id.* If the unit were full, approximately 35 individuals would eat at the same time. *Id.*

Individuals at the facility are still provided with recreation time. *Id.* ¶ 9. Due to new policies implemented to protect the safety of inmates from the risk of the spread of COVID-19, social distancing still applies during the use of the 600 square foot recreation area and masks are required for all inmates using the area. *Id.*

4. <u>COVID-19 Testing at Franklin County House of Corrections</u>

If an individual detained at Franklin County exhibits any symptoms of COVID-19, he is immediately separated from other inmates, removed from the housing unit and tested for the virus. Tirrell Aff. ¶ 19. Even if the test is negative, the individual is kept separate from the rest of the population for at least seven days. *Id.* If an inmate or detainee is exposed to a person with confirmed COVID-19, the exposed individual will be removed from the unit and placed in quarantine isolation for 14 days. *Id.* ¶ 16. This procedure will be followed even if the exposed individual is asymptomatic. *Id.*

Since the start of the outbreak, Franklin County has tested five inmates for COVID-19 symptoms. *Id.* ¶ 21. All tested negative. *Id.* There have not been any instances in which an individual at the facility with possible symptoms of COVID-19 has not been tested. *Id.* Four staff members have tested positive for COVID-19. *Id.* ¶ 22. In order for those individuals to return to work, they must meet the procedures laid out in the statement of Lori Streeter, Superintendent of

the Franklin County. *Id.* ¶ 22. One of those individuals has met the requirements and returned to work. *Id.* ¶ 25. The remaining three individuals remain at home. *Id.* ¶¶ 23-24.None of the individuals who remain at home had any contact with the Petitioners or any other detainees. *Id.*

> 5. Franklin County House of Corrections Medical Unit

The facility currently has, on hand, the appropriate personal protective equipment, and other equipment to meet the needs to combat COVID-19 and protect health care workers and other staff, including has N95 masks, procedure masks, gowns, and eye protection. Tirrell Aff. ¶ 27. The medical unit follows all standard protocols for preventing the transmission of communicable diseases. *Id.* ¶ 28. The medical unit is in good condition and is capable of treating the inmates currently at the facility. *Id.* The medical has all required diagnostic and treatment equipment required for the provision of medical care to a population the size of Franklin County. *Id.* It is not a hospital and is therefore not set up for acute care. *Id.* Thus, it does not have any ventilators. *Id.* Any individuals requiring hospitalization, including those who would require a ventilator, are immediately transferred to a medical facility. *Id.* That policy remains in place since the COVID-19 outbreak. *Id.*

There is little movement between housing units at the facility, and the medical unit is no exception. Tirrell Aff. ¶ 31. The medical facility is separated from the rest of the facility and access is limited to medical personnel and individuals authorized to enter in order to receive treatment. Tirrell Aff. ¶ 29. In order to avoid the risk of any illness being transferred between units at Franklin County, the medical staff is going to the individual units for patient care. *Id.* The medical staff visits the units two times per shift to address detainee concerns and monitor the health of the population at Franklin County. *Id.* They also respond to medical calls outside of the shift visits. *Id.*

The number of medical staff members present at the facility depends on the particular shift. *Id.* ¶ 30. There is never fewer than four members of the medical staff present at the facility. *Id.*

And some shifts have eight medical staff members present. *Id.* In total, the facility is staffed with a doctor, a nurse practitioner, fourteen full time nurses, four per diem nurses and a psychologist. *Id.* In addition, the facility has mental health professionals two of whom are current on site. *Id.*

## ARGUMENT

### I.   PRELIMINARY INJUNCTIONS ARE AN EXTRAORDINARY REMEDY

"It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (internal quotations omitted); *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008); *Peoples Federal Savings Bank v. People's United Bank*, 672 F. 2d 1, 8-9 (1st Cir. 2012) (preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right).

In moving for a preliminary injunction Petitioners "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Id.* (setting out the standard four-part test); *Equal Employment Opportunity Comm'n, v. Astra USA, Inc.*, 94 F.3d 738, 742 (1st Cir. 1996)(burden of proof in a temporary restraining order  or preliminary injunction motion is on the moving party). Thus, the Petitioners must meet all four requirements of the traditional test.

Courts are generally disinclined to issue mandatory preliminary injunctions unless the facts and law are clearly in favor of the moving party.  *See Northeastern University v. BAE Systems Information and Electronic Systems Integration, Inc.*,  Civil Action No. 13-12497-NMG, 2013 WL 6210646 at *7 (D. Mass. Nov. 27, 2017) *citing L.L. Bean v. Bank of America*, 630 F. Supp. 2d 83, 89 (D. Me. 2009). The likelihood of success on merits is the *sine qua non* of such

motions. *Jean v. Massachusetts State Police*, 492 F. 3d 24, 26  (1st Cir. 2007).

In a situation where a movant seeks to require action of the nonmoving party, in alteration of the status quo, rather than maintenance of it, courts have held the moving party to a more rigorous standard. *See Bercovitch v. Baldwin School, Inc.*, 133 F.3d 141, 151 (1st Cir. 1998).  A mandatory preliminary injunction "disturbs rather than preserves the status quo" by affirmatively mandating action by the non-moving party. *See Lewis v. General Electric Co.*, 37 F. Supp. 2d 55, 62 (D. Mass. 1999).

## II.  PETITIONERS HAVE NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.

### A. Success on the Merits Is a Threshold Determination.

Likelihood of success on the merits is a threshold issue.  *See United States v. Weikert*, 504 F.3d 1, 5 (1st Cir.2007) ("[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.") (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir.2002)). Petitioners' constitutional and statutory claims are unlikely to succeed on the merits.

The Supreme Court has made clear that "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005); *see also Appiah v. United States INS*, 202 F.3d 704, 709 (4th Cir. 2000) ("Because suspension of deportation is discretionary, it does not create a protectable liberty or property interest.").

### B. Petitioners Have Not Established a Due Process Violation.

To evaluate the constitutionality of a pretrial detention condition under the Fifth Amendment, a district court must determine whether those conditions "amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *see also Kingsley v. Hendrickson*, ——

U.S. ——, 135 S. Ct. 2466, 2473-74 (2015). Punishment may be shown through express intent or a restriction or condition that is not "reasonably related to a legitimate governmental objective." *Bell*, 441 U.S. at 539.

First, Petitioners do not present allegations or evidence to show Respondent has an "express intent" to punish Petitioners. Second, preventing danger to the community and preventing detained aliens from absconding and ensuring that they appear for removal proceedings are legitimate governmental objective. See *Jennings v. Rodriguez*, —— U.S. ——, 138 S. Ct. 830, 836 (2018); *Demore v. Kim*, 538 U.S. 510, 523 (2003); *Zadvydas v. Davis*, 533 U.S. 678, 690-91 (2001).[3] Third, Petitioners' current confinement does not appear excessive in relation to that objective. Petitioners do not cite to authority, and the counsel is aware of none, under which the fact of detention itself becomes an "excessive" condition solely due to the risk of a communicable disease outbreak—even one as serious as COVID-19.[4]

Here, there is no evidence that any inmate or detainee at Franklin County has COVID-19. And Petitioners do not address the measures Franklin County has taken and are taking to prevent such a spread from occurring. *See* Declaration of Lieutenant Lee Tirrell, attached hereto as Exhibit A, *passim*) (detailing measures to prevent the spread of COVID-19, including suspending social visitation, assessing detainees for fever and respiratory illness, isolating detainees with COVID-19-compatible symptoms, and instructing detainees on hand washing and hygiene). Finally, even if Petitioners could show a Fifth Amendment violation, Petitioners provide no authority under which such a violation would justify *immediate release*, as opposed

---

[3]       Petitioners cite *Zadvydas* for the proposition that indefinite detention is disfavored, but that aspect of the Supreme Court's decision is not implicated in this case.

[4]       These issues are discussed more fully in Respondent's opposition to Petitioner's habeas petition at pages 13 through 19.

to injunctive relief that would leave Petitioners detained while ameliorating any alleged violative conditions within the facility. *See, e.g.*, *Seifert v. Spaulding*, No. 18-11600-MGM, 2018 WL 7285967, at *2 (D. Mass. Sept. 11, 2018), report and recommendation adopted, No. CV 18-11600-MGM, 2019 WL 538253 (D. Mass. Feb. 11, 2019) ("Even where a prisoner claims that his only hope of obtaining adequate medical treatment is through release, a court cannot order release as a remedy for conditions of confinement that violate the Eighth Amendment violation."), (citing *Glaus v. Anderson*, 408 F.3d 382, 387 (7th Cir. 2005) ("If an inmate established that his medical treatment amounts to cruel and unusual punishment, the appropriate remedy would be to call for proper treatment, or to award him damages; release from custody is not an option."), and *Gomez v. United States*, 899 F.2d 1124, 1126 (11th Cir. 1990) (even where a prisoner proves mistreatment in prison that amounts to cruel and unusual punishment, "relief of an Eighth Amendment violation does not include release from confinement").  Thus, the court should conclude that Petitioners fail to meet their burden of clearly showing that they are likely to succeed on the merits of their claims.  *See, e.g., Dawson v. Asher*, No. C20-0409JLR-MAT, 2020 WL 1304557, at *2–3 (W.D. Wash. Mar. 19, 2020); *Francisco M. v. Decker*, D. N.J. March 25, 2020, Civil Action No. 20-2176 (CCC) (unpub.); *Sacal-Micha* (S.D.Tex.) (full cite forthcoming).

### D.  **Petitioners Have Not Demonstrated They Will Suffer Irreparable Harm**

As stated in *Dawson v. Asher*, No. C20-0409JLR-MAT, 2020 WL 1304557, at *2–3 (W.D. Wash. Mar. 19, 2020):

> Petitioners do not show that "irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. The "possibility" of harm is insufficient to warrant the extraordinary relief of a TRO. See id. There is no evidence of an outbreak at the detention center or that Defendants' precautionary measures are inadequate to contain such an outbreak or properly provide

medical care should it occur. Accordingly, the court concludes that
Petitioners fail to meet their burden of clearly showing that
irreparable harm is likely in the absence of an injunction.

The Supreme Court's "frequently reiterated standard requires Petitioners seeking
preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction."
*Winter*, 555 U.S. at 22 (emphasis in original). "Issuing a preliminary injunction based only on a
possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an
extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled
to such relief." *Id.* Conclusory or speculative allegations are not enough to establish a likelihood
of irreparable harm. *Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250
(9th Cir. 2013); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir.
1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a
preliminary injunction."); *Am. Passage Media Corp. v. Cass Communications, Inc.*, 750 F.2d
1470, 1473 (9th Cir. 1985) (finding irreparable harm not established by statements that "are
conclusory and without sufficient support in facts").

As stated above, Petitioners allege that only release from Franklin County into
Massachusetts (or potentially Connecticut), one of the hot spots of the American COVID-19
crisis, will spare them the heightened risk of adverse consequences from COVID-19 due to their
pre-existing conditions. This is not only speculative, but it is unlikely. Petitioners do not explain
how they will suffer irreparable harm in the absence of an order requiring their release, given
that Petitioners' existing medical care would be interrupted if not ended as a consequence of
their release. If Petitioners continue to receive adequate medical care and shelter from COVID-
19 in immigration detention, their harm is non-existent much less irreparable, and misstate the
actual conditions and measures implemented at the facility.

E. **Petitioners Have Failed to Address the Impact on the Public**

In the immigration context, the Supreme Court has consistently upheld the constitutionality of detention, citing the Government's legitimate interest in protecting the public and preventing aliens from absconding into the United States and never appearing for their removal proceedings or interfering with the effectuation of their lawfully issued final orders of removal. *See Jennings v. Rodriguez*, 138 S. Ct. 830,836 (2018); *Demore*, 538 U.S. at 520-22; *Zadvydas v. Davis*, 533 U.S. 678, 690-91 (2001). Nor is detention pending removal an "excessive" means of achieving those interests. The Supreme Court for over a century has affirmed detention as a "constitutionally valid aspect of the deportation process." *Demore*, 538 U.S. at 523 (listing cases).

Petitioners make an artificial and distorted false choice by arguing that the Court must choose between immediate release of Petitioners, or stand by idly while they all contract COVID-19. Petitioners fail to address the impact such release would have on the public's interests.

There is potential adverse impact on society if a preliminary injunction is granted. Granting the requested relief would result in the release of persons who do not require release and/or who pose a risk of harm and/or flight. Petitioners are all detained because they have a final order of removal and detention is required for a period of at least 90 days under 8 U.S.C. § 1231(a)(2) to allow ICE to effectuate the removal order. Moreover, as to Mr. Massingue, a deliberative procedure, before an Immigration Judge has now twice, resulted in a determination that he must be detained. Disrupting the statutory scheme—or second guessing the Immigration Judge's weighing of the basis for continued detention—would adversely impact society by releasing individuals with significant criminal records and would cast aside lawfully issued

orders by Immigration Judges and the Board of Immigration Appeals.  Creating a precedent that

detainees subject to removal, or who have had had bond denied, could use to nevertheless

demand and obtain release would certainly adversely impact society.

### F.  <u>The Balance of the Equities Favors Respondent</u>

It is well-settled that the public interest in enforcement of United States immigration laws

is significant. *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *Blackie's*

*House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The Supreme Court has

recognized that the public interest in enforcement of the immigration laws is significant."); *see*

*also Nken v. Holder*, 556 U.S. 418, 435 (2009) ("There is always a public interest in prompt

execution of removal orders: The continued presence of an alien lawfully deemed removable

undermines the streamlined removal proceedings IIRIRA established, and permit[s] and

prolong[s] a continuing violation of United States law." (internal marks omitted)).

In keeping with their reductionist approach, Petitioners give short shift to this portion of

the test for issuing emergency relief.  In essence, they appear to posit that nothing could justify

exposing Petitioners to the near-certain risk of contracting COVID-19.  As stated, the risk has

not been shown to be greater than that facing Petitioners if they are in the general population.

Petitioners' speculation notwithstanding, at the present time there are no confirmed cases of

COVID-19 in the inmate, detainee or prison staff population at Franklin County.

Petitioners rely on two propositions, one which is certainly true and the other very much

unproven.  First, Petitioners state that the COVID-19 virus poses significant risk.  This is true,

but it does not apply specially to Petitioners.  Second, Petitioners claim that they will surely get

infected with COVID-19 if they remain detained (and, implicitly, that they will not get infected

if released).  As argued above, this is a doubtful conclusion.

What Petitioners do not address is Respondent's interests in keeping them detained. First, Petitioners are in detention awaiting effectuation of their final orders of removal. There is a strong policy interest in maintaining the structure put in place by Congress for dealing with persons subject to removal from this country.  Congress has expressed in clear terms that the courts are not to interfere with final orders of removal.  See 8 U.S.C. §§ 1252(d), (e).  Even if this Court had the power to do so, and it does not absent a finding that the statute is unconstitutional, carving out a COVID-19 exception to the INA would impinge on society's interest in an orderly application of its laws as well as according respect to a co-equal branch of government's determination in making those laws.  It is often said that bad facts make for bad law.  The COVID-19 pandemic certainly constitutes "bad," or very challenging, facts.  We should not lose sight of the principle that we are a nation of laws, even if in challenging times.

Moreover, Petitioners' alleged injury—a heightened risk for serious consequences from COVID-19—is not redressable by release.  "Redressability requires an analysis of whether the court has the power to right or to prevent the claimed injury." *Gonzales v. Gorsuch*, 688 F.2d 1263, 1267 (9th Cir. 1982) (Kennedy, J.). For purposes of standing, a plaintiff's injury is redressable where there is "a 'substantial likelihood' that the requested relief will remedy the alleged injury." *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (citation omitted).  Petitioners' desired relief—release from detention—will not ameliorate or diminish their claimed  heightened risk of injury or death resulting from COVID-19, nor can a court order requiring release prevent Petitioners from contracting COVID-19.

Petitioners' petition for habeas relief seeking immediate release is inappropriate in the context of a conditions of confinement claim. "[T]he writ of habeas corpus is limited to attacks upon the legality or duration of confinement."  *Crawford v. Bell*, 599 F.2d 890, 891 (9th Cir.

1979). In *Crawford*, the Ninth Circuit held that "release from confinement" was not the appropriate remedy to address the petitioner's claims "alleg[ing] that the terms and conditions of [petitioner's] incarceration constitute[d] cruel and unusual punishment" and "violated his due process rights."  Id. at 891-92.  Such a claim must be brought as a civil rights claim, *Dohner v. Seifert*, 5 F.3d 535 (9th Cir. 1993), that if proven, would be remedied by "a judicially mandated change in conditions and/or an award of damages."  *Crawford*, 599 F.2d at 892.

Thus, because Petitioners do not assert any illegality or impermissible duration of confinement, Petitioners' petition for habeas relief seeking immediate release is inappropriate in the context of their conditions of confinement claim.

## **<u>CONCLUSION</u>**

The risk presented to all aspects of our society by the COVID-19 virus is very serious. ICE and Franklin County are taking the risk very seriously.  The relief sought by Petitioners is not the right response, and, for all the foregoing reasons, the Respondent respectfully request that the motion for a preliminary injunction be denied.

Respectfully submitted,

CHRISTOPHER DONELAN
Sherriff, Franklin County,

By his attorney,

ANDREW E. LELLING
United States Attorney

By:    */s/ Christopher Morgan*
CHRISTOPHER MORGAN
Assistant United States Attorney
United States Attorney's Office
300 State Street, Suite 230
Springfield, MA 01105
(413) 785-0269
Dated:  May 7, 2020               Christopher.morgan2@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify, on this 7th day of May 2020, that a copy of this filing this will be sent by U.S. Mail to the Petitioners in this matter.

*/s/ Christopher Morgan*
Christopher Morgan